[Civ. No. 53549. Second Dist., Div. Three. May 23, 1979.]

CANDACE C. CABLE, Plaintiff and Appellant, v.
SAHARA TAHOE CORPORATION, Defendant and Respondent.

**COUNSEL**

Ronald L. M. Goldman and Marilyn Garber for Plaintiff and Appellant.

Haight, Dickson, Brown & Bonesteel, Roy G. Weatherup and April Haskell for Defendant and Respondent.

**OPINION**

**POTTER, Acting P. J.**—Plaintiff Candace C. Cable appeals from a judgment (order of dismissal) in favor of defendant Sahara Tahoe Corporation in her suit for damages for personal injuries sustained in a

single vehicle accident which occurred in Douglas County, Nevada, near Stateline. The dismissal followed an order sustaining, without leave to amend, defendant's demurrer to the complaint.

The fifth cause of action sought recovery from defendant on the theory that Louis Michael Schaefer, driver of a vehicle in which plaintiff was a passenger, lost control of it as a result of becoming "excessively intoxicated" through consumption of alcoholic beverages "negligently and carelessly served or permitted to be served" to him by defendant with knowledge that he was becoming drunk and "was about to drive a motor vehicle on a public street and highway. . . ."

The complaint alleged that at all relevant times, plaintiff was a resident of the State of California and that defendant was a foreign corporation operating as the Sahara Tahoe Hotel in Stateline, Nevada, the facility at which Schaefer consumed the excessive quantity of alcoholic beverages.

The demurrer was sustained on the basis of the trial court's conflict of laws ruling that the Nevada law denying liability of tavern keepers for injury caused by customers was applicable. In reaching this ruling, the trial court properly considered a large volume of factual material not stated in the complaint but supplied by declarations in support of and in opposition to a motion to quash service of process (which was denied), answers to interrogatories and additional declarations filed in support of plaintiff's claim that she should be given leave to amend. (*Saltares* v. *Kristovich* (1970) 6 Cal.App.3d 504, 511 [85 Cal.Rptr. 866].) Except as otherwise noted below, this material did not give rise to any factual issues. It showed that at the time of the accident on August 26, 1975, plaintiff and Schaefer were driving in his car from Stateline, Nevada, to his mobile home (where he resided) in a mobile home park in the Kingsbury Grade area, a few miles east of the Stateline casino center.

Plaintiff had been employed for several months at the Sahara Tahoe Hotel and had until August 1, 1975, resided in South Lake Tahoe, California. There was room for argument as to whether plaintiff lived with Schaefer in the Nevada mobile home; she admitted staying there occasionally, and she had applied for and received a Nevada driver's license. However, plaintiff categorically denied any intent to abandon her status as a California domiciliary and for the purpose of testing the

propriety of the ruling on the demurrer we will assume that she was a California citizen.

Defendant was a corporation incorporated in Nevada. Its business was the operation of the Sahara Tahoe Hotel in Nevada. However, it was involved in a considerable amount of business activity in California. For the most part, that activity consisted of extensive advertising and other promotional activity designed to attract California residents to its hotel and casino in Nevada. This activity alone entailed expenditure of hundreds of thousands of dollars annually in California with the result that approximately 70 percent of the hotel's guests were California residents. Large purchases of equipment and supplies were regularly made by defendant in California and it leased and maintained a 100-passenger airplane in California from 1971 to 1973. In connection with such activities, defendant maintained a continuing and regular bank account in California, with an average monthly balance of $70,000. It also incurred California personal property tax liability in the amount of $21,000 for the year 1974.

Another aspect of defendant's activity involved California residents. About 75 percent of its employees lived in California in the Lake Tahoe basin and defendant had, from time to time during peak seasons, advertised in the "Help Wanted" section of the only local paper which served the entire South Lake Tahoe area. It was clear, however, that plaintiff's employment was not the result of any such solicitation.[1]

Since her injury, plaintiff has returned to California. Her injuries are catastrophic, causing paralysis from the waist down with serious psychological effects and continuous physical pain resulting in narcotics addiction. At the time of the judgment, she was a patient at a California drug rehabilitation facility undergoing detoxification and counseling. She has become and, in all probability, will remain a public charge.

Further facts which bore upon the court's decision were the histories of the California and the Nevada laws with respect to tavern keepers' liability. Nevada law, for some years, had consistently denied recovery. In 1969, the Nevada Supreme Court considered the "persuasive arguments either way" (*Hamm* v. *Carson City Nugget, Inc.* (1969) 85 Nev. 99 [450 P.2d 358, 359]) and ruled against imposing common law liability. It

---

[1]Plaintiff answered "No" to an interrogatory as follows: "Do you contend that your employment was solicited by the Sahara Tahoe Corporation while you were residing in California."

adopted in this respect the view urged by the defendant as follows (*ibid.*): "Those opposed to extending liability point out that to hold otherwise would subject the tavern owner to ruinous exposure every time he poured a drink and would multiply litigation needlessly in a claims-conscious society. Every liquor vendor visited by the patron who became intoxicated would be a likely defendant in subsequent litigation flowing from the patron's wrongful conduct. They urge that if civil liability is to be imposed, it should be accomplished by legislative act after appropriate surveys, hearings, and investigations to ascertain the need for it and the expected consequences to follow. We prefer this point of view. Judicial restraint is a worthwhile practice when the proposed new doctrine may have implications far beyond the perception of the court asked to declare it."

In addition, the court construed a Nevada criminal statute making it a misdemeanor "for one in charge of a saloon or bar to sell intoxicating liquor to any person who is drunk" (*ibid.*) as not intending to impose civil liability. This state of Nevada law remained in effect until 1973 when the Nevada Legislature adopted an entirely new approach to the problem of alcohol abuse, eliminating it from the criminal justice system. At the same time, the misdemeanor of selling intoxicating liquors to a drunk was abolished.

The history of California law on the subject was dramatically different. Prior to the decision of our Supreme Court in *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151], a long line of California cases had held that a tavern keeper was not liable to third parties injured by intoxicated persons to whom he had served liquor. (See *Cole* v. *Rush* (1955) 45 Cal.2d 345, 356 [289 P.2d 450, 54 A.L.R.2d 1137], denying liability on the theory that the consumption of the beverages, rather than their sale or gift, is the proximate cause of injury.)

*Vesely* v. *Sager, supra,* reevaluated common law concepts of proximate cause to hold that the sale or gift of the liquor was a proximate cause of the injury and found a statutory basis for liability in Business and Professions Code section 25602 which prohibited furnishing of alcoholic beverages to obviously intoxicated persons. By the time of the trial court's ruling herein, the doctrine in *Vesely* had been applied by our Supreme Court in *Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313 [128 Cal.Rptr. 215, 546 P.2d 719], to impose liability upon a Nevada tavern keeper who had furnished intoxicants to a visiting California resident when the

resident had foreseeably returned to California and caused injury in this state.

Further developments of the California law which occurred after the trial court's ruling include the decision of our Supreme Court in *Coulter* v. *Superior Court* (1978) 21 Cal.3d 144 [145 Cal.Rptr. 534, 577 P.2d 669], which extended the rule in *Vesely* to impose liability upon "noncommercial supplier[s] . . . [of] alcoholic beverages to . . . obviously intoxicated person[s]." (*Id.*, at p. 152.) More recently, the Legislature of this state reacted to this extension by substantially eradicating the whole doctrine of tavern keepers' liability in this state. Statutes of 1978, chapter 929, amended Business and Professions Code section 25602 to eliminate civil liability. At the same time, Civil Code section 1714 was amended so as to prohibit liability of any "[s]ocial host who furnishes alcoholic beverages. . . ." (Subd. (c).) The amendments to both sections contained strong statements of intent on the part of the Legislature to nullify the decisions in *Vesely, Bernhard* and *Coulter.* That contained in the amendment to Civil Code section 1714, subdivision (b), reads as follows: "It is the intent of the Legislature to abrogate the holdings in cases such as *Vesely* v. *Sager* (5 Cal.3d 153), *Bernhard* v. *Harrah's Club* (16 Cal.3d 313), and *Coulter* v. *Superior* Court ([21] Cal.3d [144]) and to reinstate the prior judicial interpretation of this section as it relates to proximate cause for injuries incurred as a result of furnishing alcoholic beverages to an intoxicated person, namely that the furnishing of alcoholic beverages is not the proximate cause of injuries resulting from intoxication, but rather the consumption of alcoholic beverages is the proximate cause of injuries inflicted upon another by an intoxicated person."

### Contentions

Plaintiff contends that (1) the choice of law required application of the "governmental interest analysis," and (2) such analysis mandates application of California law because (a) no "compelling circumstances" exist calling for departure from the law of the forum, and (b) California's interest is predominant in view of a "liability vacuum" in Nevada, California's strong interest in compensating its domiciliary, and defendant's extensive California activities placing it "at the heart of California's regulatory interest."

Defendant agrees that the "governmental interest analysis" is applicable but controverts plaintiff's other contentions.

*Discussion*

*Summary*

■ This is a "true" conflicts case. The "governmental interest analysis," therefore, requires a determination pursuant to the "comparative impairment" approach. Applying that standard, we conclude that the imposition of civil liability upon commercial purveyors of intoxicating beverages would impair Nevada's interest more significantly than the denial of such liability would impair California's interest. The judgment of the trial court will therefore be affirmed.

*"Governmental Interest Analysis" Employing the "Comparative Impairment Approach" Is the Applicable Standard*

If we assume that the application of California law would result in the imposition of liability upon defendant, the laws of California and Nevada are directly in conflict. Contrary to plaintiff's contention that there is a "vacuum" in the Nevada law, there is an active policy against such liability on the ground that it "would subject the tavern owner to ruinous exposure" and "would multiply litigation needlessly in a claims-conscious society." (*Hamm* v. *Carson City Nugget, Inc., supra,* 450 P.2d at p. 359.) On the other hand, California, until the 1978 amendments to Business and Professions Code section 25602 and Civil Code section 1714, had a rule favoring imposition of such liability based upon a "policy of preventing future harm." (*Coulter* v. *Superior Court, supra,* 21 Cal.3d at p. 153.)

Under like circumstances, our Supreme Court in *Offshore Rental Co.* v. *Continental Oil Co.* (1978) 22 Cal.3d 157 [148 Cal.Rptr. 867, 583 P.2d 721], analyzed the situation as presenting a case of "true" conflict, saying (*id.,* at pp. 163-165):

"If we assume, for purposes of analysis, that section 49 does provide an employer with a cause of action for negligent injury to a key employee, the laws of California and Louisiana are directly in conflict. Nonetheless, '[a]lthough the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied. . . . "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem;

clearly the law of the interested state should be applied." (Currie, Selected Essays on The Conflict of Laws (1963) p. 189.) [Fn. omitted.]' (*Hurtado* v. *Superior Court, supra,* 11 Cal.3d at p. 580.)

"We must therefore examine the governmental policies underlying the Louisiana and California laws, 'preparatory to assessing whether either or both states have an interest in applying their policy to the case.' (Kay, *Comments on Reich* v. *Purcell* (1968) 15 UCLA L.Rev. 584, 585.) Only if each of the states involved has a 'legitimate but conflicting interest in applying its own law' will we be confronted with a 'true' conflicts case. (*Bernhard* v. *Harrah's Club* (1976) 16 Cal.3d 313, 319 [128 Cal.Rptr. 215, 546 P.2d 719].)

"Turning first to Louisiana, we note that Louisiana's refusal to permit recovery for loss of a key employee's services is predicated on the view that allowing recovery would lead to 'undesirable social and legal consequences.' (*Bonfanti Industries, Inc.* v. *Teke, Inc., supra,* 224 So.2d at p. 17.) We interpret this conclusion as indicating Louisiana's policy to protect negligent resident tortfeasors acting within Louisiana's borders from the financial hardships caused by the assessment of excessive legal liability or exaggerated claims resulting from the loss of services of a key employee. Clearly the present defendant is a member of the class which Louisiana law seeks to protect, since defendant is a Louisiana 'resident' whose negligence on its own premises has caused the injury in question. Thus Louisiana's interest in the application of its law to the present case is evident: negation of plaintiff's cause of action serves Louisiana's policy of avoidance of extended financial hardship to the negligent defendant.

"Nevertheless, we recognize as equally clear the fact that application of California law to the present case will further California's interest. California, through section 49, expresses an interest in protecting California employers from economic harm because of negligent injury to a key employee inflicted by a third party. Moreover, California's policy of protection extends beyond such an injury inflicted within California, since California's economy and tax revenues are affected regardless of the situs of physical injury. Thus, California is interested in applying its law in the present case to plaintiff Offshore, a California corporate employer that suffered injury in Louisiana by the loss of the services of its key employee.

"Hence this case involves a true conflict between the law of Louisiana and the law of California. In *Bernhard* v. *Harrah's Club, supra,* we

described the proper resolution of such a case. We rejected the notion that in a situation of true conflict the law of the forum should always be applied. Instead, as we stated, 'Once [a] preliminary analysis has identified a true conflict of the governmental interests involved as applied to the parties under the particular circumstances of the case, the "comparative impairment" approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied.' (16 Cal.3d 313, 320.) [Fns. omitted.]"

If this same analysis is applied to the case at bench, the conclusion that this also is a case of "true conflict" is inescapable. Nevada's interest in protecting its tavern keepers from ruinous exposure by needless multiplication of litigation is no less legitimate than that of Louisiana "to protect negligent resident tortfeasors acting within Louisiana's borders from the financial hardships caused by the assessment of excessive legal liability or exaggerated claims resulting from the loss of services of a key employee." (*Id.,* at pp. 163-164.) Moreover, the legitimacy of Nevada's policy in this respect was squarely adjudicated in *Bernhard* v. *Harrah's Club, supra,* 16 Cal.3d at page 319, where the court said of Nevada's and California's respective interests, "[E]ach of the states involved has a legitimate but conflicting interest in applying its own law in respect to the civil liability of tavern keepers."

The legitimacy of state policy to protect local business from such financial hardship is also recognized by the decision in *Pacific Diamond Co.* v. *Superior Court* (1978) 85 Cal.App.3d 871, 878 [149 Cal.Rptr. 813], where the court said: "The purpose of the innkeeper statutes in Colorado is to protect domestic inns and hotels against strict liability and unlimited recovery. Thus, Colorado does have a valid governmental interest in seeing that its innkeeper statutes are applied to inns or hotels situated within its territorial boundaries."

The legitimacy of California's interest is also apparent. When a California resident is incapacitated, so as to become a public charge, "California's economy and tax revenues are affected regardless of the

situs of physical injury." (*Offshore Rental Co.* v. *Continental Oil Co., supra,* 22 Cal.3d at p. 164.)

The inquiry then becomes, as between California and Nevada, "whose interest would be the more impaired if its law were not applied." (*Bernhard* v. *Harrah's Club, supra,* 16 Cal.3d at p. 320.)

*Nevada's Interest Would*
*Be More Impaired*

The methodology of deciding which state's interests would be the more impaired if its law were not applied is specified by our Supreme Court in its opinions in *Bernhard* and *Offshore.* The shorter statement appears in the latter case where the court said (22 Cal.3d at p. 165):

"As Professor Horowitz has explained, this analysis does not involve the court in 'weighing' the conflicting governmental interests 'in the sense of determining which conflicting law manifest[s] the "better" or the "worthier" social policy on the specific issue. An attempted balancing of conflicting state policies in that sense . . . is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish.' (Fn. omitted.) (Horowitz, *The Law of Choice of Law in California—A Restatement* (1974) 21 UCLA L.Rev. 719, 753.)

"Rather, the resolution of true conflict cases may be described as 'essentially a process of allocating respective spheres of lawmaking influence.' (Baxter, *Choice of Law and the Federal System* (1963) 16 Stan.L.Rev. 1, 11-12.)"

Earlier notions that the law of the forum was controlling in the absence of "a compelling reason" for displacing it (see *Kasel* v. *Remington Arms Co.* (1972) 24 Cal.App.3d 711, 731 [101 Cal.Rptr. 314]) have no place in the comparative impairment equation. In *Bernhard,* our Supreme Court made it clear that the forum law is only a consideration in the "preliminary analysis" to identify "a true conflict," saying in this respect (16 Cal.3d at pp. 319-320): ". . . .Professor Brainerd Currie, originally took the position that in a true conflicts situation the law of the forum should always be applied. (Currie, Selected Essays on Conflicts of Laws (1963) p. 184.) However, upon further reflection, Currie suggested that when under the governmental interest approach a preliminary analysis reveals an apparent conflict of interest upon the forum's assertion of its

own rule of decision, the forum should reexamine its policy to determine if a more restrained interpretation of it is more appropriate. '[T]o assert a conflict between the interests of the forum and the foreign state is a serious matter; the mere fact that a suggested broad conception of a local interest will create conflict with that of a foreign state is a sound reason why the conception should be reexamined, with a view to a more moderate and restrained interpretation both of the policy and of the circumstances in which it must be applied to effectuate the forum's legitimate purpose. . . . An analysis of this kind . . . was brilliantly performed by Justice Traynor in *Bernkrant* v. *Fowler* (1961) 55 Cal.2d 588 [12 Cal.Rptr. 266, 360 P.2d 906].' (Currie, *The Disinterested Third State* (1963) 28 Law & Contemp. Prob., pp. 754, 757; see also Sedler in *Symposium, Conflict of Laws Round Table, supra,* 49 Texas L.Rev. 211, at pp. 224-225.) This process of reexamination requires identification of a 'real interest as opposed to a hypothetical interest' on the part of the forum (Sedler, *Value of Principled Preferences,* 49 Texas L.Rev. 224) and can be approached under principles of 'comparative impairment.' (Baxter, *Choice of Law and the Federal System, supra,* 16 Stan.L.Rev. 1-22; Horowitz, *The Law of Choice of Law in California—A Restatement, supra,* 21 UCLA L.Rev. 719, 748-758.)

"Once this preliminary analysis has identified a true conflict of the governmental interests involved as applied to the parties under the particular . circumstances of the case, the 'comparative impairment' approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state."

We must seek, therefore, to identify the " 'real interest as opposed to a hypothetical interest' " (*id.,* at p. 320) in enforcing forum law.

In allocating the respective spheres of law-making influence, it is appropriate first to consider the nature of the policy considerations in favor of liability associated with the sale of liquor. As pointed out above, *Coulter* holds that the policy behind *Vesely* and its progeny is "preventing future harm" by deterring conduct giving rise to a foreseeable unreasonable risk of injury. The state with the "predominant" interest in controlling conduct normally is the state in which such conduct occurs and is most likely to cause injury.

In *Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574 [114 Cal.Rptr. 106, 522 P.2d 666], our Supreme Court distinguished in this respect between

rules creating liability and those limiting damages. It said (*id.,* at p. 583): "As to defendants the state interest in creating wrongful death actions is to deter conduct. We made this clear in *Reich*: [*Reich* v. *Purcell* (1967) 67 Cal.2d 551 (63 Cal.Rptr. 31, 432 P.2d 727] *'Missouri* [*as the place of wrong*] *is concerned with conduct within her borders and as to such conduct she has the predominant interest of the states involved.'* (*Reich* v. *Purcell, supra,* at p. 556.) We went on to observe that the predominant interest of the state of the place of the wrong in conduct was not in rules concerning the *limitation* of damages: 'Limitations of damages for wrongful death, however, have little or nothing to do with conduct. They are concerned not with how people should behave but with how survivors should be compensated.' (*Reich* v. *Purcell, supra,* at p. 556.) Since it was not involved in *Reich,* we left implicit in our conclusion the proposition that the predominant interest of the state of the place of the wrong in conduct is in the creation of a cause of action for wrongful death." (Italics added.)

Consequently, California's interest in controlling conduct in Nevada should normally be considered subordinate to Nevada's interest therein.

We recognize, of course, that in *Bernhard* our Supreme Court found that under the special circumstances there presented, California's policy to afford protection to persons injured by intoxicated drivers was a matter of such "important and abiding interest" that to deny its application would result "that the policy of this state would be more significantly impaired." (16 Cal.3d at p. 323.) However, the manner in which the policy was stated by our Supreme Court made it clear that it has no application to persons injured outside California by intoxicated drivers sold beverages outside California, and the peculiar facts involved in *Bernhard,* which justified its holding, are not present in the instant case.

The only source of any California policy protecting those injured by intoxicated persons who have been sold or furnished alcoholic beverages while outside California is the statement of such policy in *Bernhard.* In view of the Legislature's pronouncement in its 1978 amendments purporting expressly to abrogate *Veseley* and *Bernhard* and to reinstate earlier authorities denying civil liability, it is apparent that it has not been the policy of the California Legislature to protect Californians by regulating tavern keepers in Nevada. To the extent there was any such state policy, it was the creature of the decision in *Bernhard.* Said policy is carefully defined in that opinion; specifically, the court said in this respect (16 Cal.3d at p. 322): "Mindful of the above principles governing our choice of law, we proceed to reexamine the California policy underlying

the imposition of civil liability upon tavern keepers. *At its broadest limits this policy would afford protection to all persons injured in California* by intoxicated persons who have been sold or furnished alcoholic beverages while intoxicated regardless of where such beverages were sold or furnished. Such a broad policy would naturally embrace situations where the intoxicated actor had been provided with liquor by out-of-state tavern keepers." (Italics added.)

This policy was so defined in response to the plaintiff's claim that California "has a special interest in affording this protection to all California residents *injured in California.*" (*Id.*, at p. 318.) (Italics added.)

The California policy so delimited relates only to Nevada conduct causing injury in California. Our Supreme Court neither declared nor justified any policy purporting to protect California residents injured in Nevada. Consequently, the application of a Nevada rule denying recovery in a case where both the wrong and the injury occurred in Nevada could not impair this California policy. Moreover, the court went to some lengths to justify the extraterritorial effect of the policy which was announced by showing that the injurious situation (drunk driving in California) was generated by the extensive advertising and other solicitation of business in California by the Nevada defendant to induce California residents to drink and gamble in its Stateline casino. The court said in this respect (16 Cal.3d at pp. 322-323): "We need not, and accordingly do not here determine the outer limits to which California's policy should be extended, for it appears clear to us that it must encompass defendant, who as alleged in the complaint, 'advertis[es] for and otherwise solicit[s] in California the business of California residents at defendant HARRAH's CLUB Nevada drinking and gambling establishments, knowing and expecting said California residents, in response to said advertising and solicitation, to use the public highways of the State of California in going and coming from defendant HARRAH's CLUB Nevada drinking and gambling establishments.' Defendant by the course of its chosen commercial practice has put itself at the heart of California's regulatory interest, namely to prevent tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California in the intoxicated state. It seems clear that California cannot reasonably effectuate its policy if it does not extend its regulation to include out-of-state tavern keepers such as defendant who regularly and purposely sell intoxicating beverages to California residents in places and under conditions in which it is reasonably certain these residents will return to California and act therein while still in an intoxicated state.

California's interest would be very significantly impaired if its policy were not applied to defendant."

Defendant's advertising and other solicitation of California residents to drink and gamble in Stateline are equally extensive, but plaintiff's injury was not (as it was in *Bernhard*) a direct result of the expected response. The existence of a thriving casino and bar business with commuting California residents had no logical connection with excessive drinking by Nevadans who remained in that state.

The additional fact that defendant had advertised in the "Help Wanted" section of the local newspaper and that 75 percent of its employees were local California residents does not bring Schaefer's drunk driving within California's regulatory interests. Schaefer's excessive drinking was in no respect an expected incident of this statistic. Defendant's employee recruitment activities in California could only be relevant if plaintiff's employment were a result of such recruitment (which it admittedly was not) and if plaintiff's injury were the result of some occupational hazard. (Cf. *Alaska Packers Assn.* v. *Comm'n.* (1935) 294 U.S. 532 [79 L.Ed. 1044, 55 S.Ct. 518].)

In the final analysis, the only factor which supports plaintiff's claim of California governmental interest in this case is her status as a California resident and domiciliary who, in all likelihood, will be substantially uncompensated and become a public charge. Though both her sad plight and the probable cost to California taxpayers are the subject of legitimate California concern, they do not suffice to control the allocation of Nevada's and California's " 'respective spheres of law-making influence.' " (22 Cal.3d at p. 165.) This is clear from the opinion of our Supreme Court in *Offshore Rental Co.* v. *Continental Oil Co., supra,* 22 Cal.3d 157. The court recognized the compelling nature of Louisiana's interest and said in this respect (*id.,* at p. 168): "An examination of the function and purpose of the respective laws before us provides additional support for our limitation of the reach of California law in the present case. The accident in question occurred within Louisiana's borders; although the law of the place of the wrong is not necessarily the applicable law for all tort actions (*Reich* v. *Purcell, supra,* 67 Cal.2d 551, 555), the situs of the injury remains a relevant consideration. At the heart of Louisiana's denial of liability lies the vital interest in promoting freedom of investment and enterprise *within Louisiana's borders,* among investors incorporated both in Louisiana and elsewhere. The imposition

of liability on defendant, therefore, would strike at the essence of a compelling Louisiana law."

In *Offshore,* the California plaintiff was left without compensation for a substantial loss, but the court observed in this respect (22 Cal.3d at p. 169): "By entering Louisiana, plaintiff 'exposed [it]self to the risks of the territory,' and should not expect to subject defendant to a financial hazard that Louisiana law had not created. (Cavers, The Choice-of-Law Process (1965) p. 147.)" The same may be said of plaintiff in this case. Whether or not she changed her permanent residence to Nevada, she adopted a relationship to that state which exposed her to " 'the risks of the territory' " (*ibid.*) to virtually the same extent as its permanent residents were so exposed.

Another factor considered by the court in *Offshore* was the lack of currency of the applicable California statutory policy and the fact that "California has itself exhibited little concern in applying [it] to the employer-employee relationship. . . ." (22 Cal.3d at p. 168.) Stating that "the current status of a statute is an important factor to be considered in a determination of comparative impairment" (*id.,* at p. 166), the court cited the fact that "no California court has recently considered the issue at all" (*id.,* at p. 168) as an indication that California policy would not be seriously impaired if liability were not imposed on the basis of the California statute.

The recent amendments to Business and Professions Code section 25602 and Civil Code section 1714 have a similar impact. The "current status" of California law with respect to liability based upon provision of intoxicating beverages is that it has been repudiated. Though an existing cause of action would not be nullified by the amendments, it is obvious that the impairment of such a repudiated policy has a minimal effect upon California's governmental interest.

For all the foregoing reasons, we conclude that Nevada's interest would be more impaired if its law were not applied, and consequently that Nevada law governs the present case. Since Nevada law provides no cause of action for plaintiff, the trial court properly dismissed the action.

The judgment is affirmed.

Cobey, J., and Allport, J., concurred.