685 F.2d 1192
 11 Fed. R. Evid. Serv. 812
 C. K. LIEW, Plaintiff-Appellant,
v.
OFFICIAL RECEIVER AND LIQUIDATOR (HONG KONG),
Intervenor/Plaintiff-Appellee,
OFFICIAL RECEIVER AND LIQUIDATOR (HONG KONG),
Intervenor/Plaintiff-Cross-Appellant,
v.
C. K. LIEW, Plaintiff-Cross-Appellee.
 Nos. 80-4157, 80-4167.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1981.
Decided Sept. 3, 1982.
 
 Bartholomew Lee, San Francisco, Cal., for Liew.
 Paul A. Dezurick, Graham & James, San Francisco, Cal., for Central Banking System.
 Appeal from the United States District Court for the Northern District of California.
 Before GOODWIN and HUG, Circuit Judges, and KELLAM*, District Judge.
 HUG, Circuit Judge:
 
 
 1
 This appeal arises from claims by both C. K. Liew and the Official Receiver and Liquidator (Hong Kong) (hereinafter the "Receiver") to a fund created by the settlement of claims both parties asserted against Central Banking System, Inc. ("CBSI") and Michael Rafton, its chairman. The ultimate question in this litigation is whether one Amos Dawe validly assigned his contract rights against Rafton and CBSI to Liew, or whether those rights passed by operation of law to the Receiver.
 
 
 2
 In his appeal, Liew contests only the exclusion of evidence of the involvement of the Moscow Norodny Bank in the transactions underlying this litigation. Because the evidence was of little relevance, the trial court's decision to exclude it was not an abuse of discretion. We affirm that ruling.
 
 
 3
 On cross-appeal, however, the Receiver raises some serious questions concerning the trial court's choice of law decision and its jury instructions. We hold that the court erred in its choice of law determination, and we therefore reverse and remand for a new trial.
 
 
 4
 * BACKGROUND and FACTS
 
 
 5
 In 1974, Amos Dawe was the chief executive officer of a group of Asian companies known as the Mosbert Group. Dawe managed the Group's holding company. The relevant companies in the Group were Hong Kong corporations.
 
 
 6
 In mid-1974, Dawe came to California to investigate the possibility of investing in local banks. He had discussions with Rafton and, on December 16, 1974, he purchased from CBSI over 90 percent of the stock of Peninsula National Bank ("Peninsula"). On June 12, 1975, he also purchased from CBSI over 90 percent of the stock of Tahoe National Bank ("Tahoe") and First National Bank of Fresno ("Fresno").
 
 
 7
 Dawe also entered into an agreement with Rafton to buy control of CBSI for $1 million. He gave Rafton a $240,000 down payment to cement this "D-R Agreement."
 
 
 8
 Meanwhile, in the spring of 1975, Dawe met Liew, the managing director of Chuan Hiap Seng ("CHS"), a Singapore company. By the end of August, 1975, Dawe and his Mosbert Group had borrowed approximately.$1.2 million from CHS. Liew gave the CHS board his personal guaranty on those loans.
 
 
 9
 According to Liew's trial testimony, early in September 1975, he became nervous about the loans to Dawe and demanded more security. As a result, Liew contends, on September 9, 1975, Dawe assigned his rights in the Tahoe and Fresno banks to Liew. Liew described the event of the assignment in some detail, including the redrafting of one document because of improper form.
 
 
 10
 Dawe, however, told a different story. In testimony corroborated by Mrs. Dawe, he claimed that nothing happened in September to change his relationship with Liew. Instead, Dawe testified that the assignment documents were drawn up later, probably around Christmas, and back-dated in an effort to avoid preference problems in the probable event of bankruptcy. In addition, there was evidence that notice of the purported assignment was not communicated to CBSI, the obligor, until, at the earliest, December 24, 1975.
 
 
 11
 During the fall of 1975, the Mosbert Group and Dawe suffered financial setbacks that made payment to CBSI on the bank purchases an impossibility. CBSI repossessed the stock, apparently without any setoff for the payments previously made. Dawe left Singapore, taking residence in Bangkok, Thailand. On December 26, 1975, he resigned as a director of the relevant Mosbert Group companies.
 
 
 12
 In early 1976, the Mosbert Group companies that were connected with Dawe were placed in the Hong Kong equivalent of bankruptcy, and the Receiver was appointed.
 
 
 13
 Dawe was personally declared bankrupt in Singapore in 1978. His rights against Rafton and CBSI were assigned by the representative of his bankruptcy estate to the Receiver in Hong Kong, who has pursued them in this action.
 
 II
 PROCEDURAL HISTORY
 
 14
 In August, 1976, Liew filed an action against Rafton and CBSI in the United States District Court for the Northern District of California. He claimed that as Dawe's assignee, he was entitled to recover damages under a variety of theories as a result of the disintegration of the bank sales and the D-R Agreement.
 
 
 15
 In February, 1978, the Receiver intervened, alleging that the assignment to Liew was invalid, and that Dawe's financial transactions were carried out in his capacity as an officer of the Mosbert Group, so that any recovery from CBSI and Rafton should go to the Receiver rather than to Liew.
 
 
 16
 In January, 1980, Liew and the Receiver accepted $750,000 as full and complete settlement of their claims. Dawe received $25,000, and the remainder went to the court pending resolution of the claims presented by Liew and the Receiver.
 
 
 17
 The parties stipulated that of the $725,000 remaining, $240,000 was received from Rafton as settlement of claims arising from the D-R Agreement (the "Rafton fund") and $485,000 came from CBSI to resolve claims arising from the aborted bank sales (the "CBSI fund"). A jury trial was conducted before a federal magistrate.
 
 
 18
 The jury found that the Receiver was entitled to the $240,000 Rafton fund and found that, of the $485,000 CBSI fund, Liew was entitled to $350,000 and the Receiver to $135,000. Liew appeals the award of the $240,000 Rafton fund to the Receiver. The Receiver cross-appeals the award of $350,000 of the CBSI fund to Liew.
 
 III
 LIEW'S APPEAL
 
 19
 A. Exclusion of Evidence Concerning the Soviet Bank
 
 
 20
 Liew bases his appeal solely on the contention that he was prejudiced by the trial court's exclusion of the evidence concerning involvement of the Moscow Norodny Bank. Liew sought to characterize the transactions underlying this litigation as an attempted Soviet infiltration of the American banking system. His objective was to establish the equitable affirmative defense of unclean hands against the Receiver.
 
 
 21
 Liew was unable, however, to connect the Receiver with the alleged unclean hands in the underlying transactions. As a result, the trial court granted the Receiver's motion to strike Liew's unclean hands defense. Liew did not oppose that motion. Now, however, he appeals the exclusion of evidence proffered to support the stricken affirmative defense.
 
 
 22
 Liew makes no persuasive argument that the order striking the defense was erroneous, and we find no reason to disturb that order. With Liew's allegations of unclean hands no longer at issue, the proffered evidence on the Moscow Norodny Bank's role in the transactions is of minimal, if any, relevance. Federal Rule of Evidence 403 requires the trial court to balance the probative value of proffered evidence against its potential prejudicial impact. The court here did the balancing, and excluded the evidence.
 
 
 23
 A trial court has very broad discretion in applying Rule 403 and, absent abuse, the exercise of its discretion will not be disturbed on appeal. United States v. Martin, 599 F.2d 880, 889 (9th Cir.), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979). There was no abuse here. The award of the $240,000 Rafton fund to the Receiver for damages arising out of the D-R Agreement is affirmed.
 
 IV
 RECEIVER'S CROSS-APPEAL
 A. Choice of Law
 
 24
 The major issue raised in the Receiver's cross-appeal is whether the trial court made the proper choice of law in evaluating the validity of the assignment from Dawe to Liew.
 
 
 25
 During the pretrial proceedings, Liew moved for an order that the law of California be applied to the assignment transaction. The Receiver opposed the motion, contending that the law of Singapore was applicable. The trial court ruled on the question in an opinion and order concluding that the law of California governed the assignment between Dawe and Liew. Before trial, the Receiver sought reconsideration of this order and submitted additional points and authorities. The trial court reconsidered the matter and affirmed the order.
 
 
 26
 The choice between conflicting laws affecting issues in litigation is an area that has intrigued scholars for years. Numerous competing theories have been advanced.[1] A district court in a diversity case must apply the same choice of law analysis that would be applied by state courts in the jurisdiction in which the district court is situated. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); Strassberg v. New England Mutual Life Insurance Co., 575 F.2d 1262, 1263 (9th Cir. 1978).
 
 
 27
 This action was brought in the district court in California and we look to the choice of law rules applied in that state. The approach that has been adopted in California is the "governmental interest" analysis. Offshore Rental Co. v. Continental Oil Co., 22 Cal.3d 157, 583 P.2d 721, 148 Cal.Rptr. 867 (1978); Bernhard v. Harrah's Club, 16 Cal.3d 313, 546 P.2d 719, 128 Cal.Rptr. 215, cert. denied, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976); Cable v. Sahara Tahoe Corporation, 93 Cal.App.3d 384, 155 Cal.Rptr. 770 (1979). The "governmental interest" analysis was first comprehensively developed by Professor Brainerd Currie,[2] who, in turn, recognized the major contribution of the opinions of Justice Traynor, former Chief Justice of the California Supreme Court, to his analysis.[3] The California courts have thus been in the forefront of the development of the "governmental interest" approach. California has also adopted the "comparative impairment" refinement suggested by Professor Baxter.[4] The basis of the "governmental interest" analysis as applied in California is authoritatively set out in the Offshore Rental and Bernhard cases. To follow this analysis in this case requires us to take these steps:
 
 
 28
 1. To examine the substantive law relating to assignments in Singapore and in California, to determine if the laws in the two jurisdictions differ as applied to this assignment transaction;
 
 
 29
 2. If they do differ, then to determine whether both jurisdictions have an interest in having their laws applied. If only one jurisdiction has such an interest, then we do not have a "true conflict" and we apply the law of that jurisdiction;[5]
 
 
 30
 3. If there is a "true conflict" then we proceed, under the "comparative impairment" approach, to determine which jurisdiction's interest would be more impaired if its policy were subordinated to the policy of the other. The conflict should be resolved by applying the law of the jurisdiction whose interest would be more impaired if its law were not applied.[6]
 
 
 31
 The trial court's opinion recognized that the California choice of law applied, that California applied the governmental interest analysis, and that the laws pertinent to assignments differed in the two jurisdictions. However, in applying the "governmental interest" analysis, the trial court determined that the law of the forum should apply because the Receiver made no actual showing of Singapore's interest in having its laws applied, or of how such an interest would be impaired by the California law.[7]
 
 
 32
 The governmental interest approach used in California, however, does not place this burden on the Receiver. In Offshore Rental, the California Supreme Court stated that the policies and interests of the foreign state in applying its laws need not be demonstrated by production of evidence of such policies. The Court indicated that such demonstration may be inferred as a matter of law from judicial notice of the decisional, constitutional and statutory law of that state. 583 P.2d at 725 n.5, 148 Cal.Rptr. at 871 n.5.[8]
 
 
 33
 Rule 44.1 of the Federal Rules of Civil Procedure provides:
 
 
 34
 A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.
 
 
 35
 The issue concerning the application of Singapore law was raised, due notice was given, and the policy reasons for the application of Singapore law were argued.[9]
 
 
 36
 There is no doubt that the laws of the concerned jurisdictions are different. Of particular significance is the argument the Receiver makes concerning the Singapore requirement of notice to the obligor (here, CBSI) before an assignment can be valid. Singapore Civil Law Act § 4.-(6) (ch. 30 of Singapore statutes). As it appears that no notice was given to CBSI until, at the earliest, December 24, 1975, the purported September 9 assignment would appear not to have been valid under Singapore law until the later date. That change could be very significant for purposes of establishing whether Dawe's transfer was a fraud on creditors.
 
 
 37
 California does not have a parallel notice requirement. See Smith v. Harris, 127 Cal.App.2d 311, 273 P.2d 835 (1954).
 
 
 38
 In addition, as the trial court noted, Singapore requires that an assignment, like that at issue here, be supported by present consideration. California does not. Also, unlike California law, an assignment of stock as security for a loan apparently appears not to be contemplated by Singapore law. Singapore Civil Law Act § 4.-(6) (ch. 30 of Singapore statutes) refers to "absolute" assignments, in which all legal rights in the assigned debt or chose in action are transferred to the assignee, who may exercise any ownership right without the concurrence of the assignor.
 
 
 39
 It is clear that California and Singapore have markedly different laws controlling assignments. Thus, with the initial inquiry of Offshore Rental satisfied, the district court should have proceeded with the analysis to determine if a "true conflict" exists, i.e. whether each jurisdiction has a legitimate interest in having its law applied. We proceed as a matter of law to make this determination.
 
 
 40
 There can be no doubt that Singapore has a significant interest in regulating the business transactions that take place within its borders, particularly those that affect Singaporean individuals and businesses. The manner in which security interests must be perfected to establish preference over other general creditors is a matter of commercial concern to Singapore.
 
 
 41
 The transaction we are examining is the purported September 9 assignment of rights by Dawe to Liew. We see no policy reason why California would have any interest in controlling that transaction. It is true that California has a strong interest in controlling its banking institutions, but that interest goes to the relationship between the banking institution, CBSI, and its prospective purchaser. The litigation arising from that purchase has been settled; there simply remains a sum of money in the hands of the court to be distributed to whomever is entitled to it. We are therefore only concerned here with the relationship between the assignor, Dawe, and the assignee, Liew.
 
 
 42
 As it is readily apparent that California has no legitimate interest in controlling the Dawe-Liew assignment, we hold that no "true conflict" of law exists. Singapore law must be allowed to control the assignment here, because only Singapore has the requisite interest in supervising the parties' conduct. There being no "true conflict," the final element of the analysis, "comparative impairment," need not be reached. On remand, both parties should be given the opportunity to brief the applicable Singapore law, as they see fit. Rulings on the substantive provisions of Singapore law, as applicable to the facts of this case, should be made by the trial court for application in the new trial on the issues remanded. We do not rule in this opinion on the specifics of Singapore law.
 
 B. "Contract to Assign" Instruction
 
 43
 The Receiver appeals the trial court's instruction on the existence of a contract to assign. He attacks the instruction both in its substance, and in the manner in which it was given.
 
 
 44
 The trial court properly considered and refused the requested instruction concerning a possible contract to assign. Later, after closing arguments, the court apparently decided that the instruction had to be given because of a Receiver-requested instruction on illegal contracts. Liew argues that if the instruction was erroneously given, it was invited error.
 
 
 45
 It is difficult to see how a contract to assign would have entitled Liew to the proceeds on deposit with the court. In any event, on retrial, the parties will have a full opportunity to develop their positions on this issue, and the trial court will have the benefit of their labors. As a result, we doubt that the peculiar circumstances that led to giving the instruction at the first trial will occur again. Because we have already determined that a remand is necessary, we need not address this issue.
 
 C. Form of Verdict
 
 46
 The Receiver challenges the form of verdict provided to the jury. In short, his position is that the form gave the impression that the CBSI fund could be divided between the Receiver and Liew, while, given the circumstances of the case, the controlling law makes no allowance for any such division. As we are remanding, there is no need to reach this question. At the appropriate point in the new trial, the district court will no doubt carefully consider the parties' arguments on this issue so that the form of verdict finally used is without ambiguity.
 
 D. Exclusion of Documentary Evidence
 
 47
 The Receiver also appeals the exclusion of certain documentary evidence. The trial court ruled that introducing the documents would have been an unfair surprise to Liew. Without reaching the propriety of that ruling, we note that, on remand, surprise will no longer be an issue. As the issue will not arise at the retrial, we need not address it here.
 
 V
 CONCLUSION
 
 48
 The district court's judgment is affirmed as to the $240,000 Rafton fund awarded to the Receiver. The judgment as it relates to the $485,000 CBSI fund, however, is VACATED for the reasons indicated, and the cause is REMANDED for a new trial.
 
 
 
 *
 The Honorable Richard B. Kellam, Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 For a scholarly and entertaining exposition of the major views see David F. Cavers, The Choice-of-Law-Process (1965)
 
 
 [2]
 Currie, Selected Essays on the Conflict of Laws (1963)
 
 
 [3]
 Currie, supra, pp. 629-689
 
 
 [4]
 Baxter, Choice of Law and the Federal System, 16 Stan.L.Rev. 1 (1963); see also Horowitz, The Law of Choice of Law in California-A Restatement, 21 UCLA L.Rev. 719 (1974)
 
 
 [5]
 The California Supreme Court stated in Offshore Rental Co., 583 P.2d at 724, 148 Cal.Rptr. at 870, quoting Currie:
 (a)lthough the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied.... "When one of the two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied." (Currie, Selected Essays on The Conflict of Laws (1963) p. 189.) (Fn. omitted.)
 See also Horowitz, supra, note 4, p. 729-747.
 
 
 [6]
 The California Supreme Court explained this approach in Offshore Rental Co.:
 We rejected (in Bernhard v. Harrah's Club ) the notion that in a situation of true conflict the law of the forum should always be applied. Instead, as we stated, "Once (a) preliminary analysis has identified a true conflict of the governmental interests involved as applied to the parties under the particular circumstances of the case, the 'comparative impairment' approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied." (Citations omitted.)
 As Professor Horowitz has explained, this analysis does not involve the court in "weighing" the conflicting governmental interests "in the sense of determining which conflicting law manifest(s) the 'better' or the 'worthier' social policy on the specific issue. An attempted balancing of conflicting state policies in that sense ... is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish." (Fn. omitted.) (Horowitz, The Law of Choice of Law in California: A Restatement (1974) 21 UCLA L.Rev. 719, 753.)
 Rather, the resolution of true conflict cases may be described as "essentially a process of allocating respective spheres of lawmaking influence." (Baxter, Choice of Law and the Federal System (1963) 16 Stan.L.Rev. 1, 11-12.)
 
 
 [583]
 P.2d at 725-26, 148 Cal.Rptr. at 871-872
 
 
 [7]
 The trial court's opinion also indicated that the law of the forum would be displaced only if there were a compelling reason for doing so. This is not a correct view of the "governmental interest" analysis as applied in California. First, if the foreign jurisdiction is shown to have an interest in having its law applied and the forum state has none, then there is no "true conflict" and the law of the foreign jurisdiction will be applied. Offshore Rental Co., 583 P.2d at 724, 148 Cal.Rptr. at 870; Cable v. Sahara Tahoe, 155 Cal.Rptr. at 774. Even in the situation of a "true conflict," in which both the foreign jurisdiction and the forum state have an interest in having their laws applied, the "comparative impairment" approach is followed in California. Bernhard v. Harrah's Club, 546 P.2d at 723, 128 Cal.Rptr. at 219. Although Professer Currie, in his original work, would have applied the law of the forum in this circumstance, he later modified his views, arriving at a result similar to the "comparative impairment" approach. See id. at 722-23, 128 Cal.Rptr. at 218-219
 
 
 [8]
 Footnote 5 states:
 Although, as plaintiff contends, defendant did not in fact "demonstrate" Louisiana's policies and interests in the application of Louisiana law, we may make our own determination of those policies and interests, without taking "evidence" as such on the matter. Plaintiff's contention rests on an unduly literal interpretation of our statement in Hurtado v. Superior Court, supra, 11 Cal.3d 574, 581, 114 Cal.Rptr. 106, 110, 522 P.2d 666, 670, that "generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." We note in this regard that Evidence Code section 452 expressly provides that "Judicial notice may be taken of ... (P) (a) The decisional, constitutional, and statutory law of any state of the United States ...."
 California Evidence Code section 452(f) also provides for judicial notice of the law of a foreign nation.
 
 
 [9]
 The Receiver's memorandum of points and authorities in support of his motion to reconsider the trial court's choice of law ruling was especially detailed and thorough