**Willis McGHEE; Carol McGhee; David Rudh; Chaweean Rudh, Plaintiffs–Appellants,**

**v.**

**ARABIAN AMERICAN OIL COMPANY, d/b/a ARAMCO, a corporation, Defendant–Appellee.**

No. 86–2798.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1987.

Reargued Jan. 17, 1989.

Decided March 27, 1989.

As Amended on Grant of Rehearing April 28, 1989.

John F. Wells, Oakland, Cal., for plaintiffs-appellants.

William F. Hoefs, San Francisco, Cal., for defendant-appellee.

Before GOODWIN,* Chief Judge, FLETCHER and WIGGINS, Circuit Judges.

FLETCHER, Circuit Judge:

Willis McGhee and David Rudh and their spouses brought this diversity action against their former employer, the Arabian American Oil Company (Aramco), for wrongful termination of their employment contracts and for defamation, intentional infliction of emotional distress, fraud, and conversion. McGhee and Rudh were terminated by Aramco and expelled from Saudi Arabia for renting videotapes to fellow employees from their homes in Aramco's compounds, activity that Aramco viewed as violating Saudi restrictions on commercial enterprises in the compounds.

On the contract claim, we reverse the district court's judgment notwithstanding the verdict (judgment nov) for Aramco and order reinstatement of the verdict and entry of judgment thereon. On the tort claims, we affirm the grant of summary judgment for Aramco.

## FACTS

Aramco is an oil-production company with extensive operations in the Middle East. Aramco is incorporated in Delaware; its largest operations are in Saudi Arabia. The company's wholly owned subsidiary, Aramco Services Company, operating out of Houston, Texas, conducts all of Aramco's recruiting in the United States.

In 1980, Willis McGhee, then residing in Oklahoma, and David Rudh, then residing in California, were hired by Aramco and sent, accompanied by their wives, to work in company compounds in the Kingdom of Saudi Arabia. Their employment contracts, executed in Texas, were governed by Texas law. The contracts expressly incorporated Aramco company rules which, as required by Saudi law, restated provisions of the Saudi Labor and Workmen Law (the Saudi Labor Law), including provisions making Aramco liable for terminating its employees without a "valid reason." Plaintiffs worked for Aramco until their termination on December 18, 1984. During their period of residence in Saudi Arabia, the McGhees and the Rudhs rented videotapes to fellow Aramco employees out of their homes. Plaintiffs' "video clubs" were two of many such enterprises, but theirs eventually numbered among the largest, with roughly 200 members each.

American expatriates living in Aramco's compounds were prohibited from operating commercial businesses. This prohibition derived both from Saudi commercial law and from directives that Saudi officials sent to Aramco managers. Saudi commercial law broadly proscribes the operation of any commercial business without a license. Because licenses are generally unavailable to non-Saudis, expatriates on the Aramco compounds were effectively foreclosed from operating commercial businesses. There was, however, considerable uncertainty on the compounds, and apparently within Aramco management, as to the defining characteristics of a commercial business. In January 1982, in response to a letter from the Ministry of Commerce, Aramco distributed a notice to its employees concerning the prohibition on commercial businesses. The notice included an illustrative list of prohibited activities and instructed employees to contact the Personnel Department if they had questions. Videotape rental was not listed as a prohibited activi-

---

* The original panel comprised Judges Fletcher, Wiggins and Noonan. Judge Noonan, who recused himself, was replaced by Judge Goodwin.

The panel directed that the case be reargued before the new panel.

ty. A second notice, distributed to Aramco employees in February 1983, expanded the list of prohibited activities, but again made no mention of videotape rentals. In August 1983, the Saudi Deputy Minister of Petroleum and Mineral Resources sent Aramco a specific directive outlawing all videotape activities and directing Aramco to instruct its employees accordingly. However, through the time of McGhee's and Rudh's terminations, Aramco gave no further notice to its employees concerning prohibited activities, and, specifically, said nothing concerning videotape rentals.

On December 15, 1984, Aramco received an anonymous letter claiming that McGhee and Rudh were operating "very big" businesses making and lending videotapes, "many not too nice." Aramco officials met and considered various responses, including doing nothing. Concerned that a similar letter might reach Saudi authorities, they ultimately decided to inform the Chief of Police of the Eastern Province, General Othman, and to request permission to handle the matter themselves. Othman apparently agreed to let Aramco handle the matter internally, provided that plaintiffs were terminated from their positions with Aramco in Saudi Arabia and repatriated to the United States, and that their videotapes were confiscated.

On December 16, 1984, plaintiffs were detained by Aramco security officers and informed of the anonymous letter. Security officers searched the plaintiffs' homes for pornographic tapes but no tapes meeting those officers' definitions of pornography were discovered. Some 5,388 tapes belonging to the plaintiffs were confiscated and later destroyed by Aramco at the direction of the Saudi government. On December 18, 1984, Aramco terminated McGhee and Rudh for operating unlicensed commercial enterprises in violation of Saudi Arabian law. Aramco required them to leave the country within two days. Mrs. Rudh, who was visiting her family in Thailand at the time, was directed not to return to Saudi Arabia. She flew directly to the United States from Thailand.

Plaintiffs brought this action alleging that Aramco fired them without a valid reason in violation of Saudi labor law standards that were incorporated into their employment contracts. They also argued that Aramco breached a contractual duty to provide a warning and an opportunity for correction prior to terminating an employee for an offense of this nature. The plaintiffs also raised several tort claims: fraudulent misrepresentation of Saudi legal constraints applicable to Aramco employees, defamation and intentional infliction of emotional distress arising from the circumstances of the terminations and expulsions, and conversion of the videotapes.

Upon cross motions for summary judgment the district court granted partial summary judgment for Aramco on the tort claims, finding that Saudi law controlled and precluded recovery on all counts. The court also granted partial summary judgment for McGhee and Rudh on the choice-of-law aspect of the contract claims, finding that Texas law controlled the wrongful termination claim and that the contract incorporated tenets of Saudi employment law providing damages for employees fired without a valid reason.

The contract claims were tried before a jury. At the close of the evidence, the district court denied the defendants' motion for a directed verdict, stating that "there is sufficient significant probative evidence which, if believed by the jury, is sufficient for the jury to find for the plaintiffs." To resolve Aramco's liability in contract, the district court posed three special interrogatories to the jury, to be answered separately with respect to each plaintiff. The first asked whether Aramco had a valid reason, under the principles of Saudi employment law, to terminate the plaintiffs. The second, relevant only if a valid reason was found, asked whether Aramco was estopped, under Texas estoppel doctrine, from asserting its valid reason defense. The third interrogatory, addressed to an alternative common law defense raised by Aramco, asked whether the company had acted under compulsion of the Saudi government when it terminated the plaintiffs.

The jury found that Aramco did not have a valid reason for the terminations and that Aramco's conduct was not compelled by the Saudis; it therefore awarded damages to plaintiffs. The jury's rejection of Aramco's valid reason defense precluded it from considering the plaintiffs' estoppel argument, that Aramco's knowing toleration of videotape rentals and failure to inform its employees of what it knew, or should have known, about the Saudis' view of these activities estopped the company from using the plaintiffs videotape rentals as a reason for termination. Following the trial, plaintiffs filed a post-trial motion requesting a new trial on damages, amendment of the judgment and an award of attorney's fees. Aramco moved for a judgment nov and in the alternative for a new trial, see Fed.R. Civ.P. 50(b), on the grounds that the evidence did not support the jury's rejection of Aramco's defenses and would not have supported a determination that Aramco was estopped if the jury had reached the estoppel question. The district court denied plaintiffs' motion and granted Aramco's motion for judgment nov and alternative retrial motion. McGhee and Rudh now appeal the summary judgment on the tort claims, the judgment nov, certain jury instructions, and certain evidentiary rulings. Plaintiffs also assert that the district court abused its discretion in granting Aramco's alternative request for a new trial on the contract claims, but suggests that a new trial on all the issues would be the most sensible course "given their view that a trial is required on the tort issues." We have jurisdiction under 28 U.S.C. § 1291.

## ANALYSIS

Because the events and affiliations of the parties in this suit involve several jurisdictions, both the contract and tort claims present conflict-of-law questions. The conflicts issue with respect to the contract claims is conveniently resolved by the contract's express designation of Texas law as the law of decision; the tort claims present more difficult choice-of-law problems. We consider the contract issues first before attacking the tangle of conflicts and substantive tort law questions raised by the tort claims.

## I. THE JUDGMENT NOV ON THE CONTRACT CLAIMS

The district court granted judgment nov for Aramco on the grounds that the jury had no reasonable basis for concluding that Aramco lacked a valid reason for firing McGhee and Rudh. Although the jury never reached the plaintiffs' estoppel claim, the district court's rejection of the jury's findings on the valid reason question required it to consider estoppel as well. The court found that no reasonable jury could have determined that Aramco's representations and omissions concerning the scope of the Saudi ban on unlicensed businesses estopped it from relying on the plaintiffs' violation of Saudi commercial law as a basis for termination. Plaintiffs contest the district court's analysis of both the valid reason and estoppel issues.

A district court's grant of judgment nov is subject to de novo review on appeal. We affirm judgment nov only if the evidence and inferences drawn from the evidence, "considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1981). The court must not substitute its own credibility assessment and its weighing of the evidence for the jury's; it must limit itself to determining whether the jury's verdict is supported by substantial evidence. *Id.*

### A. Whether Aramco Had a Valid Reason for Terminating McGhee and Rudh

With certain narrow exceptions not relevant here, California courts honor choice-of-law provisions in private contracts. *See S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 749 (9th Cir.1981); *see also Northrop Corp. v. Triad Int'l Mktg. S.A.*, 811 F.2d 1265, 1270 (9th Cir.1987). The district court therefore

determined that Texas law, the law of decision identified in the plaintiffs' employment contracts, governed. The district court further determined that the employment contracts incorporated an Aramco document which provides for the application of certain tenets of Saudi employment law to the relationship between Aramco and its employees in Saudi Arabia. This document, which Aramco was required to develop and submit for review by Saudi authorities by Article 9 of the Saudi Labor Law, contains two sections, "General Rules for the Organization of Work and Workmen" and "Standard Rules of Penalty and Reward." The general rules include provisions that restate Section 73 of the Saudi Labor Law, which provides a remedy for workers terminated without "valid cause." The district court found that these protections supplanted language in the contract calling for at-will termination. Thus, the district court found that its task was to apply Texas law to a contract incorporating protections against discharge except for valid cause borrowed from Saudi Law. Neither party raises any serious challenge to the district court's reasoning to this point in the analysis.[1]

■ Aramco's expert on Saudi labor law testified that the "valid reason" requirement prohibits employers from abusing their right to discharge employees. As the district court summarized this standard in its instruction to the jury, the employer must not act in an "unlawful or an arbitrary or whimsical or unreasonable manner." RT Vol. 3 at 1462. In applying this standard at the judgment nov stage, the district court found that a reasonable jury could not have denied that Aramco had a valid reason in light of the plaintiffs' operation of "commercial enterprise[s] in violation of Saudi law and the instructions of their employer" and the threat of prosecution by the Saudis if the company had not acted.[2] ER Vol. II, CR 222 at 4–5.

■ The district court erred in concluding that the evidence unequivocally showed that plaintiffs had violated company instructions. The 1981 and 1982 Aramco notices upon which the district court relied as statements of Aramco policy did not list videotape rentals as a prohibited activity. In fact, the first notice did not list any service enterprises among the examples of prohibited activities. (This omission was consistent with testimony that company officials originally believed services to be outside the Saudis' conception of business enterprises.) The second notice mentioned services, but it limited the prohibition to "services which may be available in the local market place." While both notices admonished Aramco personnel to contact the Aramco personnel office with any questions they might have about the scope of the restrictions, there was ample evidence to support the plaintiffs' claim that it was reasonable for them not to call the office even after the second directive was issued.

Plaintiffs presented evidence that they drew no income from their videotape rentals (though their conversion claims suggest that they accumulated substantial assets paid for in part by reinvested rental fees), that videotape rentals out of the homes of Aramco employees were widespread and entirely above board within the compounds, and that several Aramco employees in positions of apparent authority had indicated to the plaintiffs that their enterprises did not violate Aramco policy. The plaintiffs testi-

---

1. At oral argument, Aramco's counsel conceded that Aramco does not dispute the district court's conclusion that the employment contracts incorporate Article 9 of the Saudi Labor Law.

2. In a footnote to the judgment nov memorandum and order, the district court referred to Aramco's evidence that some of the plaintiffs' videotapes, while possibly not pornographic by American standards (and certainly not by the standards of the security officers who searched the plaintiffs' houses), were illegal under Saudi law. This evidence was properly admitted to impeach plaintiffs' testimony concerning their earnest efforts to comply with Saudi law, including Saudi censorship law. TR Vol. 6 at 1235. However, inasmuch as Aramco did not cite distribution of pornography as a reason for termination, and in fact appears to have been unaware of the offending tapes when it decided to fire McGhee and Rudh, the contents of the tape collections should not have been considered by the court as part of the evidence the jury must consider in determining whether Aramco's firing decision was reasonable.

fied to discussions about the status of their club with employees of the Personnel Department who were members of their clubs; with Fred Drucker, an Aramco lawyer, consulted by the personnel department on Saudi law issues; with George Ryan, head of Aramco's Internal Security Department; and with Willis McGhee's and David Rudh's supervisors. Several of these people were club members with direct knowledge of the size of plaintiffs' tape collections. Plaintiffs testified that the only concerns expressed to them related to the Saudis' strong aversion to pornography. In sum, a reasonable jury could have determined that Aramco did not have a policy against videotape rentals, even on the scale of the plaintiffs' operations, before it received the anonymous complaint about McGhee and Rudh.

The judgment nov also suggests that the threat of Saudi prosecution provided a valid basis for terminating the plaintiffs. The district court's brief reference to this threat seems to refer to language in the jury instructions on valid cause, which were based on the testimony of an Aramco employment law expert, indicating that an employer could validly discharge an employee if directed to do so by the Saudi government and suggesting that violation of Saudi law could also constitute a valid reason.[3]

We conclude, however, that neither the orders of Saudi officials nor the plaintiffs' violation of Saudi law foreclosed the jury from finding that Aramco lacked a valid reason for terminating McGhee and Rudh. Although compliance with a government directive was listed as one example of a

valid reason for termination in the jury instruction, nothing in those instructions (or in the expert testimony upon which the district court based its construction of the valid reason requirement) precluded consideration by the jury of the circumstances that gave rise to the Saudis' direction, including the company's failure to pass along a specific Saudi directive concerning videotape rentals and its deliberate decision to involve Saudi authorities upon receiving the anonymous letter. The emphasis on the reasonableness and fairness of the employer's action in the jury instruction encouraged consideration of the circumstances that triggered the terms of General Othman's consent to Aramco to deal with "the problem" internally. Moreover, the jury could also have doubted that General Othman's decision precluded Aramco from transferring the plaintiff to Aramco facilities outside Saudi Arabia, or to one of Aramco's subsidiaries or affiliates.

The plaintiffs concede that they violated Saudi law, if not the general commercial law against unlicensed business, then, at least, the 1983 unpublished directive, against videotape rentals which they concede carried the force of law. The jury instruction, however, stops short of stating that a worker's violation of Saudi law automatically provides a valid reason for termination. Moreover, the expert testimony upon which the district court relied in interpreting the valid reason requirement would not appear to support such a per se rule. We therefore conclude that the jury was properly instructed and based on the instructions could have reasonably rejected Aramco's argument that the company had

---

**3.** The relevant section of the jury instructions states:

Under Saudi law, the employer has no valid reason for termination of an employment contract if its acts are unlawful, arbitrary, or unreasonable, or based on whim or caprice.

Examples of a valid reason for the termination of employment include but are not limited to employee misbehavior, disobeying lawful instructions of the employer, ... direction ... by the government authorities to terminate the employment contract, conduct by the employee which causes the employer to be embarrassed, a lack of need for the employee's services by the employer, the em-

ployer going out of business or, of course, the death of the employee.

. . . .

That is not an all-inclusive list, however, and we are given for a guidance by the expert in Saudi law that what the term "valid reason" means is that the employer must not act in an unlawful or an arbitrary or whimsical or unreasonable manner.

Saudi law prohibits a foreign employee from engaging in the operation of a commercial business venture without approval of the Saudi government.

RT Vol. 8 at 17–18.

a valid reason for terminating the plaintiffs.

### B. *Whether Aramco Was Estopped From Terminating McGhee and Rudh for Violating Saudi Law*

Because the jury concluded that Aramco lacked a valid reason for firing the plaintiffs, it did not consider whether Aramco was estopped from asserting its valid reason defense. The district court, after determining that Aramco unquestionably had a valid reason, reached this question and found that no reasonable jury could have found estoppel. Because we conclude that the jury's finding that Aramco did not have a valid reason for terminating the plaintiffs was reasonable, we need not address this issue.

### C. *Whether Aramco May Invoke the Defense of Foreign Government Compulsion*

The jury rejected Aramco's defense that its termination of the plaintiffs was compelled by the Saudi government. Although the judgment nov did not address whether the jury's conclusion in this regard had any support in the evidence, Aramco argues that the absence of support for the jury's rejection of this defense provide an alternative basis for affirming judgment nov on the contract claims.

It is doubtful whether the foreign compulsion defense should ever have been presented to the jury at all. There are at least two possible bases for the view that foreign compulsion doctrine is inapplicable in cases of this sort. First, the purposes of foreign compulsion doctrine normally are not implicated in cases involving international contract disputes.[4] Avoidance of the courts' "passing on the validity" of foreign acts is the central purpose of the foreign government compulsion doctrine. *See Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 601 (9th Cir.1976). A court looks to the contract for an express or implied allocation of risks where circumstances beyond a party's control cause it to breach a contract. When a party breaches a contract because a foreign government prevented it from meeting its obligations and the court determines that the party subjected to the foreign government compulsion contracted to bear that risk, an award of damages therefore does not implicate the *legality* of the foreign government's actions. The award of damages merely indicates the court's assessment of the parties' allocation of risks.

Second, the purposes of foreign compulsion doctrine normally are not implicated in cases where liability is assessed under the legal standards of the foreign sovereign. The necessity for judicial deference to the foreign policy functions of the political branches, and thus for application of the foreign government compulsion doctrine, depends upon the depth and nature of the foreign sovereign's interest in the action in question. *Timberlane Lumber*, 549 F.2d at 607, quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). The jury was instructed to apply Saudi legal standards on the valid reason question, and reasonably concluded that under these standards the plaintiffs were entitled to damages notwithstanding the Saudi government's involvement in the events at issue. Since liability was assessed under foreign law standards, it is difficult to see how the foreign sovereign could have an interest sufficient to justify the application of foreign compulsion doctrine.

Even if we were to hold that the foreign compulsion defense is available in international contract disputes governed by the foreign sovereign's legal standards, we would uphold the jury's rejection of this defense in this case. Nothing in the case law on this defense indicates that the trier of fact should not consider whether the defendant could have taken measures to avoid or mitigate the effects of the foreign sovereign's orders. The district court's instruction to the jury on this defense accord-

---

4. To date, the defense of foreign compulsion has been used only in the context of international antitrust disputes. *See, e.g., Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 78 F.R.D. 445 (D.Del. 1978).

ingly left the jury free to consider whether Aramco could have avoided General Othman's order by passing along the specific Saudi directive on videoptape rentals or by dealing with the anonymous complaint about the plaintiffs without involving the Saudi authorities. Further, a reasonable jury could have concluded that General Othamn's order left Aramco the discretion to transfer the plaintiffs to positions outside Saudi Arabia.[5]

## II. THE ALTERNATIVE GRANT OF A NEW TRIAL ON THE CONTRACT CLAIMS

■ The district court's authority to order a new trial is admittedly less constrained than its authority to enter a judgment contrary to the jury's verdict. However, the district court may order a new trial only if it finds that the jury's verdict was "clearly contrary to the weight of the evidence." *William Inglis & Sons,* 668 F.2d at 1027; *Traver v. Meshriy,* 627 F.2d 934, 940–41 (9th Cir.1980). Since we conclude that the jury's verdict in this case was not clearly against the weight of the evidence, we hold that the district court abused its discretion when it ordered a new trial.

The plaintiffs' position respecting the alternative grant of a new trial on the contract claims is understandably guarded. Although plaintiffs do not explicitly request reversal of the retrial order, they argue that the district court abused its discretion in ordering that a new trial be held on the contractual liability issues in the event that the judgment nov were reversed. By insisting that the district court abused its discretion, the plaintiffs imply that their acceptance of a new trial on Aramco's contractual liability is contingent

on this court's determination that the tort claims must proceed to trial.

We take plaintiffs' position to be that they object to retrial of Aramco's contractual liability given our disposition of the tort issues. *See infra* section IV. We cannot say that the jury's verdict was "clearly against the weight of the evidence." Aramco failed to present substantial evidence in support of their view that the plaintiffs should have investigated whether the ban on unlicensed commercial businesses applied to videotape rental clubs. Neither of the company directives mentions services which are available only on the Aramco compound. Moreover, several Aramco officials participated in the club and assured the plaintiffs that the club was permissible. The McGhees also consulted with Fred Drucker, an attorney whom Aramco's Personnel Department relied upon for legal advice; Drucker told the McGhees that they were not in violation of the law as long as their club included no pornography. George Ryan, head of Aramco's Internal Security Department, told the McGhees that they were not violating company policy. Further, Mr. McGhee and Mr. Rudh consulted with their immediate superiors and were assured that they were not violating company policy. Finally, Mrs. McGhee consulted Aramco's Community Services Department and was told that, as long as the club included no pornography, she had nothing to worry about. In sum, the plaintiffs had ample reason to believe that they were complying with company policy.

## III. THE JURY INSTRUCTIONS ON DAMAGES

The plaintiffs challenge the district court's instructions on damages. They

---

**5.** The plaintiffs contend that judgment for Aramco on the contract claims cannot stand because the district court erroneously refused to instruct the jury concerning a second contractual duty owed by Aramco, a duty to warn the plaintiffs that their videotape enterprises violated Saudi law. Plaintiffs contend that this duty derives from two sources, warning requirements contained in Aramco's Standard Rules and a Texas common law doctrine that local law provisions enacted for the benefit of employees are automatically incorporated into employment contracts. (Plaintiffs maintain that

the August 1983 Saudi directive instructing Aramco to warn its employees against any commerce in videotape was a Saudi law intended for the benefit of Aramco employees and that Aramco was therefore contractually obligated to deliver the warning.) The district court considered and rejected the first argument on the ground that the Standard Rules apply, by their own terms, only to work-related infractions.

The second argument appears to have been raised for the first time on appeal. In any event, our reversal of the judgment nov obviates the need to consider these contentions.

contend that the district court erred in instructing the jury that (1) it was not permitted to award damages for the loss of the videotapes; (2) it was not permitted to speculate as to whether the plaintiffs would have remained in Aramco's employ for "a long time"; and (3) the general practice of the Saudi Labor Commission is to award three months' lost wages to employees terminated without a valid reason.

## A. *The Value of the Videotapes*

■ The district court did not err in instructing the jury not to award damages for the loss of the videotapes. As noted above, Aramco's employment contracts in effect incorporate Section 74 of the Saudi Labor Law. This section provides that damages for a workman terminated without a valid reason shall take into account the nature of the work, the period of service, the workman's age, the pay he was receiving, the family burdens he shoulders, the extent to which his income from his new job is lower than the income from his old job, the degree of arbitrariness of the discharge decision, the extent to which the discharge affects the workman's reputation, and any other conditions and concomitant circumstances in accordance with the rules of equity and current generally accepted practice.

Aramco presented the testimony of an expert on Saudi labor law to the effect that Section 74 does not permit the award of damages for losses to an employee's property. Since this testimony was uncontradicted, we find no basis for the plaintiffs' argument.

■ Even if Texas law provided the standard for contract damages in this case, we would hold that the district court's instruction was proper. Under Texas law, damages for breach of contract include losses that are "natural, probable, and foreseeable consequence[s]" of the breach. *LaChance v. Hollenbeck*, 695 S.W.2d 618, 621 (Tex.App.1985). The plaintiffs have never seriously disputed testimony to the effect that the Saudi authorities ordered the confiscation and destruction of the videotapes. Under these circumstances, we cannot characterize the destruction of the tapes as a "consequence" of Aramco's decision to terminate the plaintiffs.

## B. *Future Employment*

■ We also reject the plaintiffs' argument that the district court erred when it instructed the jury that Saudi law prohibits speculation as to whether the plaintiffs would have remained in Aramco's employ for a "long time." RT Vol. 8, 1468. Section 74 states that damages awards must reflect "current generally accepted practice." Aramco's expert witness on Saudi law testified that Saudi practice is to limit damages to losses which are not speculative and which are foreseeable. In this respect, Saudi law does not differ from standard American contract law, which requires that damages "be certain." Calamari and Perillo, *Contracts* 599 (1987).

The plaintiffs did not present any evidence suggesting that workers in their position reasonably could expect to remain with Aramco for a long time. Had Aramco not terminated the plaintiffs because of their operation of the videotape rental club, it is possible that after a few years the plaintiffs would have left Aramco for professional or personal reasons or conditions in the industry could cause reductions in the employment force.

## C. *Saudi Labor Commission Awards*

■ The plaintiffs' challenge to the district court's instruction on the customary awards of the Saudi Labor Commission is similarly unpersuasive. An expert witness's testimony that the Commission generally awards three month's wages was uncontradicted. The Commission's practice of awarding three months' wages is obviously evidence of "current generally accepted practice" in Saudi Arabia. Moreover, any error in this instruction was harmless because the district court explained to the jury that "you are free to exercise your own judgment and you are not bound by what the Saudi Labor Commission or a Saudi Court would do or award." RT Vol. 8, 1468–69. Nor was the jury award so limited.

## IV. THE SUMMARY JUDGMENT FOR ARAMCO ON THE TORT CLAIMS

We review the district court's grant of summary judgment to Aramco on the tort claims de novo. Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether the district court overlooked any issue of material fact or committed any legal error. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986).

The district court's summary judgment decision for Aramco on the tort claims presents questions pertaining to both the choice of the proper legal standards and the application of those standards to the case at hand. We find that the district court was correct in its determination that Saudi law governed the defamation, intentional infliction of emotional distress, fraud, and conversion claims and that Saudi law barred recovery on those counts.

California resolves choice-of-law questions using "governmental interest analysis," to find the proper law to apply based upon the interests of the litigants and the involved states. *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 161, 583 P.2d 721, 723, 148 Cal.Rptr. 867, 869 (1978) (quoting *Reich v. Purcell*, 67 Cal.2d 551, 553, 432 P.2d 727, 729, 63 Cal.Rptr. 31, 33 (1967)). The burden is on the party seeking to invoke foreign law; California applies its own rule of decision unless a party litigant properly invokes the law of a foreign state. A party advocating application of foreign law "must demonstrate that the [foreign] rule of decision will further the interest of that foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Hurtado v. Superior Court*, 11 Cal.3d 574, 581, 522 P.2d 666, 670, 114 Cal.Rptr. 106, 110 (1974); *see Liew v. Official Receiver and Liquidator*, 685 F.2d 1192, 1197 (9th Cir.1982).

California's version of governmental interest analysis entails three steps. First, the court must determine whether the proposed foreign rule of decision differs from the forum rule. *Offshore Rental*, 22 Cal. 3d at 161–62, 583 P.2d at 723–24, 148 Cal.

Rptr. at 869–70. If there is a difference in the possible rules of decision, the court must next examine each jurisdiction's interest in the application of its standard to determine whether a "true conflict" exists. *Id.*, 22 Cal.3d at 163, 583 P.2d at 725, 148 Cal.Rptr. at 870–71. If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a "false conflict" and the law of the interested jurisdiction is applied. If more than one state has a legitimate interest, the court must move to the third stage of the analysis, which focuses on the "comparative impairment" of the interested jurisdictions. At this stage, the court seeks to identify and apply " 'the law of the state whose interest would be the more impaired if its law were not applied.' " *Id.*, 22 Cal.3d at 165, 583 P.2d at 726, 148 Cal.Rptr. at 872 (quoting *Bernhard v. Harrah's Club*, 16 Cal.3d 313, 320, 546 P.2d 719, 723, 128 Cal.Rptr. 215, 219 (1976)). If distinct claims for relief implicate different alignments of interests among the relevant jurisdictions, separate applications of a governmental interest analysis are required. *See Beech Aircraft Corp. v. Superior Court*, 61 Cal.App.3d 501, 518, 132 Cal.Rptr. 541, 550 (1976).

### A. Defamation and Intentional Infliction of Emotional Distress.

■ There is no real dispute that California law and Saudi law differ as to the treatment of the plaintiffs' defamation and emotional distress claims. California permits recovery for damage to character, *Gomes v. Fried*, 136 Cal.App.3d 924, 186 Cal.Rptr. 605, 614 (1982), and for emotional injury caused by willful and outrageous behavior, *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 295, 97 Cal. Rptr. 577, 582–83 (1971). In contrast, Saudi law, according to the uncontradicted declaration of Aramco's expert Dr. Saba Habachy, does not allow money damages for injuries of this nature.

■ California's connections to the plaintiffs in this case are insufficient to create an interest in applying California law to the plaintiffs' defamation and emotional distress claims. The McGhees have

never resided in California. The Rudhs resided in California before David Rudh took his position with Aramco. However, when the alleged defamation and intentional infliction of emotional distress occurred, the Rudhs had long since abandoned their California residence and had no intention of returning within the next six years.[6] We are unaware of any case in which a California court (or a federal court applying California law) has held that a litigant's former residency in California, abandoned before the events giving rise to a cause of action, helps to place that cause of action within California's sphere of legitimate influence. The Rudhs' return to California does not assist them. Following Justice Traynor's analysis in *Reich v. Purcell*, 67 Cal.2d 551, 553, 432 P.2d 727, 729, 63 Cal.Rptr. 31, 34 (1967), the lead case on governmental interest analysis in California, the courts have consistently declined to recognize after-acquired residence as a source of governmental interest on the grounds that consideration of this factor would encourage forum shopping. *See, e.g., Roesgen v. American Home Prods. Corp.*, 719 F.2d 319, 321 (9th Cir.1983); *Zimmerman v. Allstate Ins. Co.*, 179 Cal.App.3d 840, 847, 224 Cal.Rptr. 917, 920 (1986). *But see id.*, 179 Cal.App. 3d at 848–49, 224 Cal.Rptr. at 921 (dissenting opinion).[7]

Plaintiffs also advance a novel and wholly unsupported theory that American states have an interest, recognizable under California governmental interest analysis, in extending the benefits of "American common law" to American citizens living and working abroad.[8] Plaintiffs cite two cases in support of this purported governmental interest in disfavoring foreign law. *Randall v. Arabian American Oil Co.*, 778 F.2d 1146 (9th Cir.1985), upheld an American plaintiff's access to American courts to litigate an employment claim arising out of events in Saudi Arabia notwithstanding provisions of the Saudi Labor law that call for all such claims to be decided by Saudi labor tribunals. *Randall*, however, emphatically distinguished between the interest in providing an American forum and the interest in applying American law, stating "we find paramount interest in providing a forum to a United States citizen seeking to sue a United States corporation on a[n] employment contract negotiated and made in the United States.... [O]ur forum provides due regard for the interests of Saudi Arabia by using the substantive Labor Law [of Saudi Arabia] as the rule for decision." *Id.* at 1153 (emphasis supplied). *Cuevas v. Reading & Bates Co.*, 577 F.Supp. 462 (S.D.Tex.1983), is equally far afield. In *Cuevas*, a district court in Texas determined that Philippine law should govern injuries incurred on an oil drilling rig 100 miles off the coast of Saudi Arabia by workers who were Philippine domiciliaries and citizens. The court relied principally on Supreme Court precedent concerning international choice of law for maritime claims; it had no occasion to discuss the claim that American citizenship, as distinct from state domicile or residence, creates a state interest in applying more favorable "American" law to a state law

---

**6.** At trial, the plaintiffs sought to introduce evidence that at the time of his termination David Rudh's plans were to remain with Aramco until his retirement benefits vested in 1990.

**7.** Plaintiffs' brief alleges that Aramco's defamation against the McGhees "was also repeated in the airplane over the Atlantic in their return to this country." Brief of Appellants at 36. But McGhee testified only that he and his wife overheard a fellow passenger, employed by a contractor with business in Riyadh, recount that two unidentified Aramco employees had been expelled from the country for dealing in pornographic videotapes. This does not constitute republication under California law.

**8.** Plaintiffs do not argue that the absence of a remedy for defamation and intentional infliction of emotional distress under Saudi law warrants the invocation of California's narrow, public policy exception to the resolution of conflicts through a neutral comparison of government interests. This exception applies only when foreign law is "so offensive to [California] public policy as to be 'prejudicial to the recognized standards of morality and to the general interest of the citizens....'" *Wong v. Tenneco*, 39 Cal.3d 126, 135, 702 P.2d 570, 216 Cal.Rptr. 412 (1985) (quoting *Knodel v. Knodel*, 14 Cal.3d 752, 765 n. 15, 537 P.2d 353, 122 Cal.Rptr. 521 (1975)).

claim.[9]

Finally, plaintiffs also assert Aramco's contacts with California as a basis for the application of California law. The plaintiffs point out that one of Aramco's four shareholders, Chevron, has its headquarters in California and that Aramco has regularly recruited Californians for its foreign work force. Plaintiffs have not alleged, however, that Chevron or Aramco's recruitment subsidiary played any direct role in defaming or traumatizing them. California courts have rejected arguments that a party's contacts with California, unrelated to the cause of action at hand, create a basis for extending the reach of California's law. In *Gallagher v. Koppers*, 142 Cal.App.3d 713, 716, 191 Cal.Rptr. 241, 245 (1983), a paint company's manufacturing operations in California were considered irrelevant to the choice of law issue in a products liability suit involving an injury caused by paint that the defendant manufactured in Oregon. Similarly, in *Cable v. Sahara Tahoe Corp.*, 93 Cal.App.3d 384, 397, 155 Cal.Rptr. 770, 778–79 (1979), the court rejected a California plaintiff's argument that California law should govern her dram shop suit against a Nevada casino for injuries she sustained in Nevada because the casino drew patrons and employees from California. The court held that the defendant's activities in California were relevant only insofar as they bore on the circumstances of the accident in question. *Id.* at 397, 155 Cal.Rptr. at 776. Under the second stage of California's government interest analysis, the court takes a hard look at California's interest in applying its law, "reexamin[ing] its policy to determine if a more restrained interpretation of it is more appropriate." *Bernhard*, 16 Cal.3d 313, 316, 546 P.2d 719, 723, 128 Cal.Rptr. 215, 219. Applying this restrained perspective, we see no policy underlying California's law of defamation and emotional distress that could support the extension of California's substantive law to these facts.

The absence of an interest on California's part sufficient to sustain one side of a "true conflict" does not settle entirely the conflicts question. Unless Saudi Arabia has a legitimate interest in the application of its law, California's weak, but pervasive, interest in applying its own law would still prevail. Aramco's expert on Saudi tort law provided little insight into the policies or interests served by the omission of a cause of action for defamation (except in the case of an action brought by the state to punish an unfounded charge of adultery), or by the general absence of a means to recover for "emotional or moral harm." ER Vol. II, CR 73 at 8–9. The mode of analyzing governmental interests employed by California courts, which determines governmental interests from legislative history, case law, and inferences drawn from the logical tendency of rules to favor one class of litigants over another, may be difficult to apply to a system of law based on sacred text, clerical commentary, and royal decree. Under California law, Aramco, the party seeking to dislodge the law of the forum, bears the burden of establishing that the foreign jurisdiction has an interest, cognizable under California conflict-of-law principles, in the application of its law to the dispute at hand. While the court may take judicial notice of authoritative sources of foreign law at its disposal, *see Offshore Rental*, 22 Cal.3d at 163 n. 5, 583 P.2d at 725 n. 5, 148 Cal.Rptr. at 871 n. 5, when no legitimate foreign interest can be determined from the sources adduced by the party advocating foreign law, the court is entitled to apply the law of the forum. *See* Cal.Evidence Code § 311(a) (West 1966 and Supp.1989).[10]

In the context of the defamation and intentional infliction of emotional distress claims, where Aramco need only show

---

**9.** *See also* E. Scole & P. Hay, *Conflict of Laws* § 4.11 (1984) (contrasting American reliance on domicile to determine personal rights and obligations in international conflicts cases with nonfederal countries' reliance on nationality).

**10.** Rule 44.1 of the Federal Rules of Civil Procedure embodies a similar conception of the court's role in researching questions of foreign law. Although the court is permitted to take judicial notice of authoritative statements of foreign law, nothing requires the court to conduct its own research into obscure sources. *See Twohy v. First Nat'l Bank*, 758 F.2d 1185, 1193 (7th Cir.1985); *see generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2444 at 408 (1971).

some legitimate Saudi interest, we believe that Aramco has met its burden. Whatever the specific interests underlying the Saudi rule may be, it seems certain that Saudi Arabia has some legitimate interest in seeing that Saudi law determines the consequences of actions within its borders causing injury to people who reside there. *See, e.g., Hernandez v. Burger,* 102 Cal.App.3d 795, 802, 162 Cal.Rptr. 564, 568 (1980); *see also Cable,* 93 Cal.App.3d at 395–96, 155 Cal.Rptr. at 777–78. California, despite its interest in securing recovery for its residents, will not apply its law to conduct in other jurisdictions resulting in injury in those jurisdictions. Where, as here, no other jurisdiction has a legitimate interest in the application of its law, we believe that the general governmental interests in determining the legal consequences of purely local activity preempts the application of forum by default.

■ Plaintiffs point out that the Saudi government exempts foreign nationals living in the Aramco compounds from many legal strictures that apply elsewhere within the country. They suggest that the Saudis' toleration of practices within the confines of the Aramco compounds that are proscribed elsewhere, including coeducation, women driving and wearing western dress, and certain forms of entertainment, demonstrates a diminished interest in the application of Saudi law to Aramco's expatriate employees. The record in this case concerning the government's posture toward the Aramco compounds, however, casts doubt on the plaintiffs' portrayal of Saudi disinterest. The plaintiffs' estoppel argument in connection with their contract claims rests largely on Aramco's failure to apprise its employees of the intensity of the Saudis' concern about unlicensed businesses in the compounds. Moreover, the record contains repeated references to Saudis efforts to enforce prohibitions on pornography and alcohol in the compounds.

In short, despite the extremely thin basis in the record for fixing the boundaries of Saudi Arabia's legislative jurisdiction on the basis of Saudi interests, we find that the district court was correct in applying Saudi law to the defamation and emotional distress counts and in granting summary judgment based on Aramco's uncontested showing that Saudi law would not allow recovery on these causes of action.[11]

**B. *Fraud***

■ The choice-of-law question pertaining to the fraud claim is complicated by the introduction of a third jurisdiction, Texas, into the governmental interest calculus. Aramco initially argued, in its motion for summary judgment, that Texas law provided the proper rule of decision for the fraud claim. The plaintiffs agreed that Texas had the strongest interest in the application of its rules, but argued for the application of California law on the grounds that there was no material difference between California and Texas law on points relevant to this claim.

The district proceeded directly to the comparison of government interests without identifying differences in the treatment of plaintiffs' fraud claim under California, Texas, and Saudi law. Presumably, this approach reflected a belief that a clear imbalance in governmental interests would obviate the need to consider the viability of the fraud claim under the laws of all three jurisdictions and the interests served by the approach of each jurisdiction. The court determined that Saudi law should govern because Saudi Arabia's "strong interest in regulating and determining standards for liability of tortfeasors within its borders" would be impaired to a greater extent by the application of California law (assuming a true conflict) than California's interest in applying its tort law would be impaired by application of Saudi law. ER Vol. II, CR 222 at 11. The district court

---

11. Plaintiffs also point out that Section 74 of the Saudi Labor Law provides for increased compensation when a worker's reputation is damaged in the course of an unlawful discharge. They argue that this provision shows that the Saudi aversion to moral and psychic damages is weaker in suits involving terminated employees. This argument might have some weight if we

were balancing the interests of two jurisdictions in a "true conflict" case. The alleged inconsistency in the treatment of moral and psychic injury under Saudi law is irrelevant, however, where Saudi Arabia is the only jurisdiction with a cognizable interest in the application of its law.

granted summary judgment on the fraud claim on the strength of the testimony of Aramco's expert, based on his understanding of the facts, that Saudi law would not permit recovery on this claim.

We conclude that the district judge correctly applied Saudi law. The complaint states that "Aramco represented to the plaintiffs, both expressly and by implication, that notwithstanding the laws, customs and mores of Saudi Arabia, the operation of private videotape clubs was permissible within Dhahran and Ras Tanura." ER Vol. I, CR 1 ¶ 12. These alleged misrepresentations regarding videotape clubs apparently were made in Saudi Arabia. Saudi Arabia has a significant interest in regulating conduct within its borders. *See, e.g., Hernandez v. Burger,* 102 Cal.App.3d 795, 802, 162 Cal.Rptr. 564, 568 (1980). The alleged fraudulent representations were not made in Texas or California, and the plaintiffs have only tenuous personal connections to California, *see supra* section IVA, and even weaker connections to Texas.[12]

### C. *Conversion*

█ The district court correctly determined that Saudi law governed the plaintiffs' conversion claims. The tapes were confiscated in Saudi Arabia at a time when all relevant parties resided in Saudi Arabia. For the reasons recited in the earlier discussion of the defamation and emotional distress claims, California has no interest recognizable under California choice-of-law principles in the application of its law to these claims.

█ We also agree with the district court's conclusion that Saudi law precluded recovery for conversion. Dr. Habachy testified that the plaintiffs' conversion claims were not viable under Saudi law. He explained that his opinion was based on his "understand[ing] that plaintiffs' videotapes were confiscated by Aramco at the direction of Saudi authorities." ER Vol. 1, CR 73 at 9. The plaintiffs do not seriously dispute the testimony of A.A. Rawai'i, Manager of Aramco Affairs for the Eastern Province, that on being informed of the plaintiffs videotape rentals, General Othman of the Saudi police ordered that the tapes be confiscated and destroyed.

### CONCLUSION

The judgment nov on the contract claims is reversed. A reasonable jury could have concluded that Aramco lacked a valid reason under Saudi law, as set forth in the record of this proceeding, for terminating the plaintiffs. Since the verdict was not clearly against the weight of the evidence, we also hold that the district court abused its discretion in granting Aramco's alternative motion for a new trial. We affirm the district court's grant of summary judgment on the tort claims.

The plaintiffs moved for attorney's fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code, which permits a court to award attorney's fees for a valid claim based on an oral or written contract. The district court denied plaintiffs' motion without explanation. Since the district court's denial of the plaintiffs' motion for attorney's fees may have been premised on its erroneous view that ARAMCO was entitled to judgment nov on the breach of contract claim, we remand to the district court for reconsideration of the plaintiffs' motion for attorney's fees.

The judgment of the district court is AFFIRMED in part and REVERSED in part and REMANDED. The plaintiffs are entitled to their costs on appeal.

---

12. Although we affirm the district court's choice-of-law decision, we note that there are at least two reasons to disfavor short-circuiting California's three-step governmental interest analysis. First, the shortcut disregards the comity concerns underlying the effort to eliminate false conflicts in step two of the California governmental interest analysis. *Cf.* Kay, *The Use of Comparative Impairment to Resolve True Conflicts: An Evaluation of the California Experi-*ence, 68 Cal.L.Rev. 577, 604–10 (1980) (criticizing California's addition of the comparative impairment step due to courts' tendency to accept the existence of true conflicts too readily where outcome of interest comparison seems clear). Second, courts should be wary of concluding that one jurisdiction's interests must prevail, no matter how compelling those interests might appear to be, without having identified the countervailing interests of the other jurisdiction.